**SAFE FLIGHT INSTRUMENT CORPORATION, Plaintiff,**

v.

**STENCEL AERO ENGINEERING CORPORATION, Defendant.**

**Civ. A. No. 3145.**

United States District Court,
W. D. North Carolina,
Asheville Division.

Dec. 4, 1970.

James M. Baley, Jr., of McGuire, Baley & Wood, Asheville, N. C., David B. Kirschstein, of Kirschstein, Kirschstein, Ottinger & Frank, New York City, for plaintiff.

O. E. Starnes, Jr., of Van Winkle, Buck, Wall, Starnes & Hyde, Asheville, N. C., Donald A. Kaul, of Arnold, Roylance, Kruger & Durkee, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

WOODROW WILSON JONES, Chief Judge.

This action was instituted by the plaintiff, Safe Flight Instrument Corporation, a New York corporation with its principal office in White Plains, New York, against the defendant, Stencel Aero Engineering Corporation, a North Carolina corporation with its principal office in Arden, North Carolina, seeking injunctive and compensatory relief for alleged trademark infringement and unfair competition. The action is brought under and by virtue of the Trademark Laws of the United States, Title 15, United States Code, 1051, et seq.

Plaintiff is the owner of the trademark SCAT as used for a computerized electronic flight director system installed in an aircraft to indicate low speed operating conditions to the pilot. This trademark was first used by the plaintiff in 1958 and registered with the United States Patent Office February 21, 1961, and assigned Number 711,499.

The defendant began using its trademark SCAT in 1965 for ballistically deployed parachutes, and on August 4, 1967 applied for federal registration. The plaintiff filed an Opposition seeking to bar registration of defendant's mark, and extensive depositions were taken by the plaintiff and the defendant in the Patent Office Opposition proceeding. At the close of all the evidence the plaintiff instituted this action on October 1, 1969, and moved to suspend the Patent Office proceeding pending the outcome of this case.

On January 22, 1970, defendant filed a Motion for Summary Judgment pursuant to Rule 56, Federal Rules of Civil Procedure, and on May 11, 1970, plaintiff filed a Cross-Motion for Summary Judgment. Plaintiff and defendant agree that the facts developed in the depositions, exhibits, and affidavits in the Patent Office and in this Court, clearly establish the material facts of the controversy and are undisputed. The only controversy concerns the manner in which the law applies to these particular facts.

The Court, after a careful consideration of the pleadings, affidavits, the admitted facts, briefs, and oral argument of counsel, finds and concludes as follows:

The plaintiff is engaged in the manufacture, sale, and distribution in interstate commerce of safety systems and instruments for the aircraft and aerospace industries. All of plaintiff's products are designed, manufactured, and sold for the purpose of increasing the safety of aircraft. Among the products manufactured and sold by the plaintiff is an electronic flight director system which indicates to the pilot the precise attitude and power requirements of an aircraft during all low speed operating conditions. The system includes several components, namely: a lift transducer, computer, flap transmitter, and indicator, and is identified by the trademark SCAT which plaintiff uses in connection with the manufacture, sale, and advertisement of the apparatus. This trademark was adopted and first used by plaintiff in 1958 and was registered in the United States Patent Office on February 21, 1961, and assigned Registration Number 711,499. The trademark certificate indicates that the system is defined as "Apparatus for giving information which is a function of lift in an aircraft".

The defendant manufactures and sells in interstate commerce parachutes which are used by sports parachutists and military personnel for the purpose of making premeditated jumps. In 1965 the defendant designed and now manufactures a ballistically operated parachute under the trademark SCAT, and on August 4, 1967 applied for federal registration of said mark. The application was assigned Serial Number 277,572, and was reviewed by the Trademark Examining Division of the Patent Office and was found to be entitled to registration and defendant was so advised on May 20, 1968. During the examination by the Patent Office the Trademark Examiner at no time cited or called attention to plaintiff's Registration Number 711,499. Shortly after publication of defendant's trademark in the Official Gazette of the Patent Office on June 11, 1968, plaintiff filed an Opposition seeking to bar registration of defendant's mark. Plaintiff thereafter instituted this action on October 1, 1969, and upon its motion the Patent Office proceeding was suspended pending the outcome of this suit.

Both plaintiff and defendant manufacture and sell products connected with safety in the aircraft and aerospace field. Generally, plaintiff's products deal with the safe operation of aircraft while the defendant's products pertain mostly to the safety of flight personnel. The plaintiff sells a variety of products such as stall warning systems, speed control systems, speed command systems, horn and lighting warning units, and other warning systems and devices, as well as test equipment for the support of these products. The defendant in addition to the ballistically deployed parachute,

manufactures and sells an ejection seat system and a dart stabilization system which is a parachute for stabilizing the plane in the event of a spin. The plaintiff does not now manufacture nor sell a parachute and has no plans to develop or manufacture one in the future. The defendant does not now manufacture nor sell an electronic flight director system and has no plans to do so in the future. The products of both plaintiff and defendant are used by the military and civilian trade.

The product manufactured by the plaintiff under the SCAT trademark is identified as "An automatic computing system which indicates to the pilot the precise attitude and power requirements for an airplane during all low speed operating conditions, such as during take-off and landing". It is estimated that this product with the autopower system sells for approximately $20,000 and without the autopower system the price would range from five to fifteen thousand dollars. The defendant's product manufactured and sold under the SCAT trademark is identified as "ballistically deployed parachutes" and can be defined as "It's a parachute that uses a ballistic aid to decrease the deployment time", and sells for approximately $300. The company name and address appear on all name plates used on the SCAT system manufactured and sold by plaintiff, and each parachute made and sold by the defendant is clearly identified by its name and address and the trademark SCAT.

Sales of defendant's SCAT parachute have been concentrated largely with the military and have amounted to approximately $30,000 per year. Until recently the defendant has not been able to afford a venture into the commercial market due to its size and lack of capital, but it believes it has now reached the point where it can afford such a venture. Plans are now under way for expansion and considerable sums have been expended in the commercial promotion and advertisement of the SCAT parachute. It is exhibited at trade shows attended by military and industrial personnel, pilots, engineers, and the public in general. Brochures describing the parachute and its operation are distributed to persons attending the trade shows. The defendant has employed the use of motion pictures to familiarize potential customers with its parachute and its uses. At least one article on the SCAT parachute has appeared in an aviation magazine.

Plaintiff's SCAT system and the components thereof have been sold and advertised continuously from 1961 to date under its trademark. Total dollar sales ranged from $367,000 in 1963 to a high of $2,828,000 in 1966. These sales dropped to $912,000 during the year 1969. Plaintiff uses the trademark SCAT on name plates applied to the components of the system, on sales brochures, proposals, quotations, booklets, technical manuals, drawings, orders, reprints of articles in magazines, stock prospectuses, signs at trade shows, and other similar items. These materials are distributed to a wide variety of persons in the field of aviation such as professional and non-professional pilots, commercial, corporate and private airplane pilots, mechanics, engineers, maintenance men, purchasing personnel and management personnel of airlines, aircraft manufacturers and corporations, owners of commercial and private planes, and the military. These products are advertised in such magazines as Air Facts and Flying, and at trade shows in the field of aviation in this country and abroad. Articles on plaintiff's SCAT system have appeared in Flying Magazine, which is a general circulation magazine, in Aviation Week and Space Technology, and in Business and Commercial Aviation, trade magazines or publications.

Plaintiff has purchased airplanes and installed the SCAT system for the purpose of demonstrating its uses. Pilot-salesmen have been employed to give demonstrations, promotion talks, and to make personal contacts with pilots, maintenance men, engineers,

executives and purchasing personnel of commercial aircraft fleets, corporate aircraft fleets and aircraft manufacturers. Plaintiff also maintains a staff of three additional salesmen who actively solicit orders for the system, and has purchased and outfitted a demonstration van called SCATmobile, which is driven from place to place to demonstrate the operation of the SCAT system to potential customers. Altogether plaintiff has expended more than one and one-half million dollars in promoting its products over the years but these expenses include the original cost and maintenance of the demonstration planes and mobile vans.

While plaintiff and defendant sell their products to the military and civilian trade, the record discloses that they have only one common purchaser, namely, the United States Air Force. The defendant has sold its SCAT products regularly to Wright-Patterson Air Force Base, and plaintiff has sold its SCAT system for installation on three (3) air force planes at the same base. The buyers at Wright-Patterson and all other installations of the Air Force, are experienced and trained, and are assigned and operate in specialized departments. It is not likely that the persons who would purchase parachutes would be the same people who would purchase aircraft or aircraft equipment. The products themselves are so different that there is very little likelihood of confusion. Plaintiff uses its own sales and marketing force and the defendant sells its SCAT product by personal sales visits and technical presentation. There is virtually no chance of confusion or mistake arising in such sales.

The sole issue to be determined by this Court is whether the defendant's use of the identical trademark SCAT on ballistically deployed parachutes constitutes trademark infringement and unfair competition in view of plaintiff's prior use and registration of its SCAT trademark for computerized electronic flight director systems for aircraft. In determining this issue the controlling question is whether on the basis of the evidence before the Court the defendant's use of the trademark SCAT on its product is likely to cause confusion, mistake, or deception. This is the statutory test set forth in the Lanham Act, 15 U.S.C.A., § 1114, which reads in pertinent part as follows:

"(1) Any person who shall, without the consent of the registrant—

"(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive:

\* \* \* \* \* \*

"shall be liable in a civil action by the registrant \* \* \*."

In determining the question of the likelihood of confusion, the Court must not only look to the trademarks involved but to many other related factors. This was clearly pointed out in Durox Co. v. Duron Paint Mfg. Co., 320 F.2d 882 (885) (4th Cir. 1963):

"We think the trial court was correct in taking into consideration the weak nature of the marks involved, the specific differences in the goods of the parties, the different marketing channels through which the respective goods moved, the difference in customers (whether the goods have common purchasers or not) and the type of persons who purchase the goods (whether sophisticated and knowledgeable)."

A collection of these factors are listed in the American Law Institute, Restatement of Torts, Section 731, of the April 22, 1963 draft as follows:

"Sec. 731 FACTORS IN DETERMINING INFRINGEMENT RELATIONSHIP BETWEEN INVOLVED GOODS, SERVICES OR BUSINESS

In determining whether or not an actor's designation infringes another's

trademark for goods or services, collective mark, certification mark or tradename under the rule stated in Section 717, the following factors, among others, concerning the goods, services or business are important:

(a) the likelihood that the actor's goods, services, or business will be confused with or mistaken for those of the other;

(b) the likelihood that the other may expand his business so as to compete with the actor;

(c) the extent to which the goods or services involved have common purchasers or users;

(d) the extent to which the goods or services involved are sold by the same marketing methods and marketed through the same channels;

(e) the relation between the functions and uses of the goods or services involved;

(f) the degree of distinctiveness of the mark or trade name;

(g) the degree of attention usually given to trade symbols in the purchase of the goods or services involved;

(h) the length of time during which the actor has used the designation;

(i) the intent of the actor in adopting and using the designation;

(j) the celebrity of the mark or tradename involved."

The parties to this action admit that the marks involved are identical as each consists of the word SCAT. The evidence supports and the Court has found that the plaintiff had adopted, registered and used the mark on its product prior to the use by the defendant. However, these acts do not entitle the plaintiff to use the trademark for all goods. It is established law that where identical marks are used by different parties for different products there is no infringement. Arrow Distilleries v. Globe Brewing Co., 117 F.2d 347 (4th Cir. 1941); Ambrosia Chocolate Co. v. Ambrosia Cake Baking, Inc., 165 F.2d 693 (4th Cir. 1947); California Fruit Growers Exchange v. Sunkist Baking Co., 166 F.2d 971 (7th Cir. 1947); Westward Coach Mfg. Co. v. Ford Motor Company, 388 F.2d 627 (7th Cir. 1968), cert. denied 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386; Blazon, Inc. v. Blazon Mobile Homes Corp., 416 F.2d 598 (7th Cir. 1969).

Although the products manufactured and sold by plaintiff and defendant are generally connected with the safety of air flight their products are nevertheless quite different. Plaintiff's product deals with safe flight of the aircraft itself, while the defendant's product deals with the safety of flight personnel. Plaintiff's product is "an automatic computing system which indicates to the pilot the precise attitude and power requirements of an airplane during all low speed operating conditions, such as take-off and landing", while the defendant's product is "a parachute that uses a ballistic aid to decrease deployment time". The average price of plaintiff's product ranges from $5,000 to $20,000, while the average price of defendant's product is $300. Each party's product is identified by the company name and address.

Plaintiff has never produced any parachutes and there was no evidence to indicate any plans that its business will be expanded to include such production in the future. Plaintiff's SCAT product and its components are sold to aircraft manufacturers and corporations, airlines, and the military, while defendant's SCAT product or parachute is sold to sports parachutists and the military for military personnel. There is admittedly one common purchaser, namely, the Air Force, but the evidence discloses that the military personnel who would purchase defendant's parachute would not be the same personnel who would purchase plaintiff's product. Such military personnel are experienced and specialized and would not be expected to be confused as to either the source of supply or the

in use of the products. The SCAT product of plaintiff and defendant is sold by their respective sales departments and there is little chance of confusion or mistake arising in such sales. The function and use of the respective products are entirely different.

The mark involved in this action is the word SCAT which is suggestive of fast movement. It is a term used by a human being directed to a cat, meaning to "move on". Webster's Seventh New Collegiate Dictionary gives the following meaning: "to go away quickly" or "to move fast". The term has been employed by many different parties as a trademark for various products as follows:

| Registration No. | Goods |
|---|---|
| 733,333 | Motorcycles |
| 757,472 | Fresh Fruits |
| 760,120 | Metal Scarecrow |
| 827,247 | Cat Food |
| 842,050 | X–Ray Apparatus |
| 867,433 | Sailboats |

Apparently the marks of the plaintiff and defendant are acronyms. Plaintiff's SCAT mark is an acronym derived from *S*peed *C*ommand of *A*ttitude and *T*hrust, while defendant's SCAT mark is an acronym derived from *S*afety *Cat*apulted. Nevertheless, the mark is a common every day dictionary word used by millions of Americans daily in telling a house cat to "move on", and it must be considered relatively weak and nondistinctive. The fact that both parties contend it to be an acronym formed from different words does not add to its strength or distinctive character.

Plaintiff cites and relies upon Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245 (4th Cir. 1970), as strong reenforcement for its position. However, such reliance is misplaced. There the trademark COMSAT was held to be a strong mark and a famous name and as such was entitled to broad protection. The court found that "COMSAT has become recognized throughout the United States as identifying and distinguishing plaintiff and its communication services." Large sums of money have been spent using its name in promoting services and recruiting personnel. Its stock, listed as COMSAT, has been traded on the New York Stock Exchange since 1964. The court held that COMSAT has established a secondary meaning that qualifies it for protection. The facts of the case at bar do not entitle the plaintiff to come under the umbrella of the COMSAT case.

■ Assuming arguendo, that plaintiff has gained some degree of celebrity or secondary meaning for its mark, this must be limited to its product. The plaintiff is not entitled to extend this celebrity to cover every product that might be directly or indirectly connected with the field of aviation or even with the field of safety in aviation. The fact that plaintiff has registered its mark does not give it a monopoly on that name except as to its aircraft computer instrument. California Fruit Growers Exchange v. Sunkist Baking Company, *supra;* Durox Company v. Duron Paint Mfg. Co., *supra.*

■ The Court concludes that prospective customers are not likely to believe (1) that defendant's goods are those of the plaintiff, nor (2) that they emanate from the same source as the plaintiff's goods; nor (3) that they are approved or sponsored by the plaintiff, nor (4) that the defendant's business is the business of, or is associated with the plaintiff's business. Restatement of Torts, Section 717(1); Communications Satellite Corp., v. Comcet, Inc., *supra.*

There is no basis to presume that the defendant adopted its mark with the intention of trading on plaintiff's good name. The products are non-competitive and there is no evidence of any confusion, deception, or mistake. There has been no showing of any damages arising out of the alleged infringement of the trademark by the defendant.

Both parties have moved for Summary Judgment, thereby indicating that the matter is ripe for such consideration.

The Court finds that there is no genuine issue as to any material fact, and concludes that the plaintiff is not entitled to prevail against the defendant, and that the defendant's Motion for Summary Judgment should be granted. An order to that effect will be entered simultaneously herewith.

The Court's jurisdiction is bottomed under 15 U.S.C.A., 1051, et seq., and 28 U.S.C.A., 1338(a).