**AMP INCORPORATED, Plaintiff,**

v.

**Howard J. FOY, Jr., et al., Defendants.**

**No. C–C–72–169.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 10, 1974.

Supplemental Opinion Aug. 23, 1974.

---

1. Cf., Burgher v. West States Air, Inc., C.A.No.5061 (D.R.I. December 1973).

Floyd A. Gibson and Charles B. Elderkin, Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., for plaintiff.

James L. Roberts, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### FINDINGS OF FACT

*The Plaintiff*

Plaintiff sues to prevent alleged infringement of plaintiff's trademarks on the phrase "AMP."

The plaintiff was organized in 1941 under the original name of Aircraft Marine Products. Plaintiff adopted the corporate name "Amp Incorporated" in 1956. Plaintiff terms it an acronym derived from the capital letters of its original name, "Aircraft Marine Products Inc." Plaintiff has obtained and holds seventeen trademarks, dating back to 1944, on the word "AMP." The formal validity of those trademarks is not in issue here. The question is the scope of the monopoly afforded by those trademarks. Plaintiff says they entitle it to exclusive use of "AMP," in all its forms, in commerce relating to electricity; defendant says that although the trademarks may entitle plaintiff to exclusive use of the term "AMP" in the *manufacture and distribution of internal components* of electrical devices, they do not confer a monopoly of the term in the business of electrical *repairs and installation.*

Plaintiff advertises under its "AMP" name nationwide and internationally in numerous trade publications, and runs occasional advertisements in FORBES, FORTUNE and BUSINESS WEEK. Its 1973 advertising budget was about eight

million dollars, or two per cent of its operating budget.

Plaintiff's business is that of manufacturing and distributing soldered and solderless terminals and other *components* of electrical circuits for aircraft, boats, home appliances and other electrical appliances and installations, it is not a manufacturer of electrical *appliances*. Plaintiff does not manufacture and sell wire, switches, fuses or electrical receptacles to electrical distributors. (Plaintiff has served notice that it intends to produce and has started setting up capacity to manufacture and sell receptacles and switches for mobile homes and other residences. This, as far as the record shows, is apparently the closest that plaintiff promises to come to producing something that is likely to be seen by the general public or to be purchased as a unit by a journeyman electrician.) The plaintiff does not provide electrical *services*, whether through contracting, installation or repair. Most and perhaps all of plaintiff's products are internal to the appliances and structures of which they form a part.

Plaintiff's primary customers are power companies, discount houses, and manufacturers of electrical appliances. Plaintiff also sells certain electrical connectors and other items to several electrical distributors in Charlotte, at least two of which sell *other* electrical products to the defendant. A few Amp products are sold at stores like Sears and Woolco. These products usually bear house names such as Sears or Woolco. On such products the trade name "Amp" is not prominently displayed.

Amp has offices in the United States and in fourteen foreign countries; its total sales 1969 through 1973 were $1,-378,817,000.00. It is listed on the New York Stock Exchange as "AMP" and it has places of business for the manufacture or distribution of its products in Cary, Charlotte, Clemmons, Gastonia, Greensboro, Kernersville and Winston-Salem, North Carolina.

In Charlotte, plaintiff has had a *manufacturing* facility since 1965, which now employs about 158 persons. The facility is listed in the white section of the Charlotte telephone directory, though not in the yellow pages, as "AMP Incorporated." Several times it has advertised in local newspapers as "AMP Incorporated" to attract new employees, but it has not apparently advertised its *products* in local press and radio.

### The Defendant Foy

Howard J. Foy, Jr., the principal defendant, is an electrical contractor and repairman who does household wiring and repair and who also installs and repairs electrical appliances, including installations and repairs for customers of discount stores in this area, such as Woolco, K-Mart and Zayre. Salesmen in those stores refer customers to Foy for installation work.

Foy was a Nike radar repairman in the Army. Some sixteen or seventeen years ago he started work as an electrician with his father and has been in the electrical repair and contracting business ever since. He and his brother Robert operated for a number of years as Ace Electric and American Electric Company. They separated and stopped using the Ace name and someone else appropriated it. Foy, looking for another name which would provide him a listing close to the front of the "A's" in the telephone book, decided to use the name "Amp Electric Company" for his own individual operation. Before adopting the name he had seen a sign on a building of the plaintiff in Charlotte which said "Amp Incorporated" and he knew there was a business with such a name in Charlotte.

There is testimony pro and con on the question whether the defendant's method of printing, spacing and styling the letters "AMP" is sufficiently different from the plaintiff's method that they are not, *per se*, representations of the same thought; these distinctions may not be factually or legally significant although they are genuine; decision of the case will turn, not on whether the two words or the two combinations of

letters *are* the same in substance, but on whether under the circumstances it is *permissible* that they be the same in substance.

I also find that there is nothing ingenuous about the circumstances under which defendant adopted the name "Amp" for his electrical repair business; the question is not defendant's ignorance of the prior use of the word "Amp" by plaintiff, but whether, knowing that plaintiff was using the word, defendant can nevertheless also use it.

Foy does not manufacture, fabricate or sell any electrical products either at retail or wholesale. He testified that almost all of his work is residential work. Foy has never used nor purchased any of the plaintiff's products in his work as an electrician. His closest point of contact with plaintiff's business is that defendant buys certain electrical supplies from local electrical supply houses who purchase *other* electrical supplies from the plaintiff. So far as the record reveals, the things that the plaintiff sells to the electrical suppliers are just not the stuff with which journeymen electricians like Foy ply their trade.

The customers of plaintiff and defendant are different.

The sources of supply of plaintiff and defendant are different.

The products of plaintiff and defendant are different.

The activities of plaintiff and defendant are different.

There is not even any *confusion* of advertising, because plaintiff's advertising is all directed toward one specific trade (large manufacturers, large power companies, electrical suppliers and electrical distributors and discount houses), while defendant's advertising is addressed to the householder who is the direct purchaser of defendant's services.

## AMP

The word "amp" is a household word. A French physicist named André Ampere (1775–1836) is credited with describing the flow of electrical current; his name became attached to the description of electrical flow and the word "amere" is the standard measure of electric current everywhere. An ampere is equivalent to a flow of one coulomb per second or to the steady current produced by one volt applied across a resistence of one ohm (Webster's 7th New Collegiate Dictionary, 1967).

All household appliances and electrical circuits, switches and connective devices are rated, and their safety features are defined, in terms of the amount of current which they draw; and this current is rated in amperes. The conventional way of marking electrical appliances in this country is with the abbreviation "amp." The plug-in or screw-in household fuse which blows out when wires are crossed or a circuit is shorted bears a printed legend such as "7 amp"; "15 amp"; "30 amp"; *et cetera*. A similar legend appears on virtually all electrical appliances which draw any substantial volume of electric current.

At the hearing defendant displayed a tray of a hundred or more electrical appliances and connectors of widely varying nature, all of which bore the abbreviation "amp" or "amps," prefixed with a number to show the amperage of a particular circuit. On such devices, "amp" is usually singular, not plural.

The testimony shows that the word "amp" is an everyday word in the jargon of electrical suppliers, sellers, buyers and users; that the defendant has been using the term since he first began to become familiar with electrical work at the age of seven or so; that the word has been in the public domain for a century and a half; and that it is a well recognized feature of the English language.

A household use of the term in an area far removed from the crass realms of trade is found in a not so recent collection of limericks by William S. Baring-Gould:

"A lady removing her scanties
Heard them crackle electrical chanties;
　Said her husband, 'My dear,
　I very much fear
You suffer from amps in your panties."

The plaintiff says that its intended entry into the manufacture of switches and receptacles for home wiring puts it in such competition with defendant that injunction should issue against defendant's use of the name "Amp" because of the likelihood of such confusion in competition.

It is not necessary to use a mountain and the squirrel or a David and Goliath metaphor to deal with this problem. If plaintiff has rights against defendant, plaintiff is entitled to protection of those rights, even though the damage might be miniscule. The real answer to plaintiff's proposition is that defendant's use of "Amp" is not likely to confuse or mislead plaintiff's customers; a local electrician who repairs and installs household wiring and appliances is simply not in competition with a large *manufacturing* corporation which makes *component parts* for other people's boats, airplanes, switches and electrical appliances; which never sells anything for the retail trade under its own name; which installs nothing it manufactures; which advertises to householders nothing it sells; which repairs nothing for householders and which does nothing at any level that is essentially similar to the electrician's work.

Plaintiff offered some evidence that records had been kept in 1973 since plaintiff had consulted counsel, and that there had been four or five instances in which people had telephoned plaintiff's Charlotte manufacturing plant seeking to talk to Mr. Foy, or in which bills were received by plaintiff's manufacturing plant which were intended for Mr. Foy. Three such bills were introduced. Of course, plaintiff had not paid such bills. There was also evidence that out of the fifty or so telephone calls a day which came in to the plaintiff's local manufacturing establishment there were three calls between June and December of 1973 which were intended for Amp Electric Company. There was also one instance of a trucker who attempted to deliver to plaintiff some cargo addressed to the defendant; the cargo was refused with-

out incident, as was the custom of plaintiff when such mistakes occurred, which was not unusual.

I am unable to find that customers of plaintiff have been confused or are likely to be confused by the electrical repair and contracting activities of Howard Foy under the name of "Amp Electric Company."

The fact that plaintiff may have a valid trademark for the use of the name in connection with the manufacture of (usually) hidden components of electrical circuits does not entitle plaintiff to expand the exclusive use of that 150-year-old household word into other and unrelated fields, even though in those fields electricity may be one of the commodities involved.

I find that the word "amp" has not in this area acquired a secondary meaning indicating plaintiff as the origin or source of electrical products.

Although I find the defendant in his small way to be as hard nosed and intransigent as plaintiff is in its large way, I do not find that there was any intention or expectation that his use of the term "amp" in his business name would enable defendant to capitalize on any good will, publicity, trade or other asset which plaintiff might have built up in this part of the world.

## CONCLUSIONS OF LAW

Surprisingly, there appears to be a fair amount of relevant authority in the form of decisions of federal courts. A case which appears very similar in principal is Safe Flight Instrument Corp. v. Stencel Aero Eng. Corp., 323 F. Supp. 279 (W.D.N.C.1970). Plaintiff Safe Flight owned a trademark "SCAT" under which it marketed and advertised a computerized electronic flight director system for guidance of aircraft under low speed operating conditions. (The name "SCAT" is an acronym, according to the plaintiff, derived from the initials of the words "Speed," "Command of Attitude," and "Thrust.") The defendant filed an application for a trademark on

the word "SCAT" for use in the manufacture and sale of a ballistically deployed parachute. Like plaintiff's "SCAT," defendant's "SCAT" was also an acronym. In a thorough and well reasoned opinion, Chief Judge Woodrow W. Jones of this district concluded that the plaintiff was not entitled to an injunction against the defendant's use of the word "SCAT." It was, of course, clear that both products are connected with safety in the aircraft and aerospace field. Both have to do with flight or safe return from flight. Both are connected with flying and both market their "SCAT" item and other items to the United States Air Force and to the same air force bases. Nevertheless, Judge Jones pointed out that plaintiff's guidance system deals with the safe operation of aircraft while defendant's products deal mainly with the safety of flight personnel seeking to get out of ailing aircraft. Though both parties market to the military, the procurement officers are different and confusion between an aircraft guidance system and a pilot safety ballistically operated parachute is not likely to occur. Plaintiff had invested a million and a half dollars in developing and advertising its products; defendant's operation was on a smaller scale and the price of the defendant's product was about $300 as opposed to the average price of $5,000 to $20,000 for the plaintiff's product. Judge Jones found that prospective customers were not likely to confuse either the source or the nature of the goods nor to associate the two companies simply because they both used a household word in the advertising and marketing of their product. It was duly noted in the opinion that the word "SCAT" is an everyday household word by which cats are commanded to "move on." Infringement was not found and injunction was denied. In the opinion Judge Jones called attention to the proposition that:

". . . It is established law that where identical marks are used by different parties for different products there is no infringement. Arrow Dis-

tilleries v. Globe Brewing Co., 117 F. 2d 347 (4th Cir. 1941); Ambrosia Chocolate Co. v. Ambrosia Cake Baking, Inc., 165 F.2d 693 [cert. denied 333 U.S. 882, 68 S.Ct. 914, 92 L.Ed. 1157 (1948)] (4th Cir. 1947); California Fruit Growers Exchange v. Sunkist Baking Co., 166 F.2d 971 (7th Cir. 1947); Westward Coach Mfg. Co. v. Ford Motor Company, 388 F.2d 627 (7th Cir. 1968), cert. denied 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386; Blazon, Inc. v. Blazon Mobile Homes Corp., 416 F.2d 598 (7th Cir. 1969)." 323 F.Supp. 279, 284 (W.D.N.C.1970).

In the *Ambrosia* case the Fourth Circuit Court of Appeals denied an injunction on the basis of estoppel. However, on the merits they indicated that even though the Ambrosia Chocolate Company and the Ambrosia Cake Baking Company were in the same business (food), nevertheless, "ambrosia" was considered too common a word to entitle plaintiff to the same extended protection as "distinctive, unique, fanciful, arbitrary word[s]" like "Kodak" or "Aunt Jemima," 165 F.2d 696.

In other cases cited by Judge Jones, the courts held that although Arrow cordials and liquers, like Arrow beer, were also intoxicants, nevertheless the name "Arrow" could be used by manufacturers of both types of beverages. In the *Mustang* case the use of the word "Mustang" as a title for an automobile was held to be no infringement of the trademark of the plaintiff who was using the name previously for campers and trailers.

In Williams v. Lykens Hosiery Mills, 233 F.2d 398 (4th Cir. 1956) (cert. denied, 352 U.S. 840, 77 S.Ct. 61, 1 L.Ed. 2d 56), the Fourth Circuit Court of Appeals held that where the defendant packaged a railroad work sock in a package similar to plaintiff's package, the defendant's use of the word "Trainman" as a name for the sock was an infringement of the name "Railroad" on which the plaintiff had a trademark. The obviousness of the identical product in a similar package for the identical consum-

er made the use of the name so similar to the plaintiff's mark unfair.

In the most recent Fourth Circuit case, Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245 (4th Cir. 1970), on which the plaintiff relies, "Comsat" was held entitled to restain the defendant from use of the name "Comcet" in the sale of communications computers. The court emphasized the following factors: "Comsat is a coined word that is not found in any dictionary . . . Comsat has only one function. It uniquely identifies the plaintiff's business and services." In addition, independent of its origin, "Comsat has established a secondary meaning that qualifies it for protection . . . National magazines and newspapers frequently refer to the plaintiff by its trade name, Comsat . . . These facts, coupled with Comsat's uniqueness as a coined word, establish it as a strong mark and a famous name. Cf. Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830, 831 (7th Cir. 1963); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 908 (3rd Cir. 1952)." 429 F.2d 1248.

It is apparent that "AMP" is not truly a coined word. It is used in more than one context. Millions of people use it in electrical contexts daily. It has no secondary meaning peculiar to plaintiff's product or operation. It does not uniquely identify plaintiff's business or services. Plaintiff and defendant are not competitors. Their products are not similarly packaged. There is no evidence that any purchaser or prospect would be likely to confuse Foy's electrical contracting and repair operations with plaintiff's manufacturing operations. Plaintiff's impressive advertising budget is of no serious legal significance.

Defendants' use of the phrase "Amp" in the title of Foy's electrical repair and installation business, "Amp Electric Company," does not violate plaintiff's trademarks.

Defendant will tender an appropriate judgment.

Counsel for plaintiff has called attention to the fact that the memorandum of decision filed on June 10, 1974, does not expressly deal with the plaintiff's second cause of action which alleges a claim for imitation of the trade name of the plaintiff and alleged unfair competition in the use of the word "Amp" in defendant Foy's business. Based upon the facts already found, the court finds and concludes that Foy's use of the word "Amp" in his business of electrical repair and installation does not constitute unfair competition in trade; that it is not confusingly similar to plaintiff's trade name and does not have a natural and probable tendency to deceive the public nor to pass off Foy's goods and services as those of the plaintiff; that Foy is not trading upon reputation or good will of the plaintiff and has not been shown to profit from the alleged infringing uses of that name, and that no damage to the plaintiff, irreparable or otherwise, flows from Foy's use of "Amp" as a trade name.

In response to plaintiff's motion, therefore, the previous memorandum of decision is hereby amended as above stated.