IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MATTHEW KENT and RENEE KENT, :
                                            :     ID No. K16C-04-022 NEP

        Plaintiffs,               :     In and for Kent County

                                            :

       v.                          :

                                              :

THE DOVER OPHTHALMOLOGY    :
ASC., LLC d/b/a BLUE HEN SURGERY :
CENTER; REBECCA A WEBER      :
SWEET, R.N.; and JACQUELINE A.   :
TILLER, R.N., BSN-BC, MSN.      :

                                              :

        Defendants.             :

Submitted: January 19, 2018
Decided: March 2, 2018

**MEMORANDUM OPINION**

## I.     Introduction

Before the Court are motions *in limine* filed by Plaintiffs Matthew Kent (hereinafter "Mr. Kent") and Renee Kent (hereinafter "Ms. Kent" and "Plaintiffs" collectively) and by Defendants Dover Ophthalmology ASC., LLC d/b/a Blue Hen Surgery Center (hereinafter "BHSC"), Rebecca A. Weber Sweet, R.N. (hereinafter "Nurse Sweet"), and Jacqueline A. Tiller, R.N. (hereinafter "Nurse Tiller" and "Defendants," collectively). This opinion sets forth the Court's decision on the motions.

Plaintiffs are suing Defendants in medical negligence for injuries allegedly suffered by Mr. Kent as a result of an upper endoscopy procedure at BHSC on June 26, 2014. In their complaint, Plaintiffs allege that prior to the procedure, Nurse Sweet made several unsuccessful attempts to insert an I.V. into Mr. Kent's right hand. Mr. Kent complained

of pain. Nurse Tiller then took the I.V. needle from Nurse Sweet and inserted the same needle into Mr. Kent's right forearm. Mr. Kent again complained of a cold and burning pain, but the catheter was not removed, and his complaints were not addressed. He received anesthesia, and approximately 90 minutes later, the procedure was finished and the catheter removed. Defendants deny that the same needle was inserted into Mr. Kent's forearm, and they deny that Mr. Kent complained of pain. Mr. Kent argues that, as a result of the Defendants' negligent actions regarding the insertion of the I.V. catheter, he contracted Chronic Regional Pain Syndrome (hereinafter "CRPS"), which caused him to suffer various damages, including the loss of his employment with the Delaware Capitol Police. Over three years later, after the filing of the instant suit, an employee of BHSC, Nurse Seaman, made certain additions to Mr. Kent's medical chart prior to her deposition regarding Mr. Kent's treatment.

Currently before the Court are the following motions *in limine*: (1) Defendants' motion to preclude the causation opinions of Enrique Aradillas-Lopez, M.D.; (2) Plaintiffs' motion to exclude certain opinions of Daniel M. Feinberg, M.D.; (3) Defendants' motion to preclude standard of care opinions of Elizabeth Nottingham, R.N.; (4) Defendants' motion to strike expert disclosure and preclude the expert testimony of Michelle Smeltzer, MSN; and (5) Defendants' motion to exclude vouching evidence. There are two additional matters that Defendants raised in the pretrial stipulation which, although submitted past the deadline for motions *in limine*, the Court agreed to consider and determine. These are (6) Defendants' motion to preclude evidence of Nurse Seaman's additions to Mr. Kent's medical chart; and (7) Defendants' motion to preclude cumulative lifestyle testimony concerning Plaintiffs' damages.

## II.    Discussion

### A.    Defendants' Motion to Preclude Causation Opinions of Enrique Aradillas-Lopez

Defendants argue that two of Dr. Aradillas's opinions should be excluded pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[1] because the opinions are unreliable and not based in science or on sufficient facts and data. Defendants object first to Dr. Aradillas's "prolonged contact theory," which asserts that Mr. Kent's CRPS was caused by the needle's striking his radial nerve and the I.V. cannula's remaining in contact with the nerve for an extended time, continuously traumatizing the nerve. Defendants next object to Dr. Aradillas's "dulled needle theory," which asserts that multiple attempts to insert the needle into Mr. Kent's skin caused the needle to be dulled and contributed to the injury. Defendants argue that there is no specific scientific basis for either opinion, and that the opinions should not be offered into evidence.

Plaintiffs, as the proponents of Dr. Aradillas's testimony, bear the "burden of establishing the relevance [and] reliability [of the testimony] . . . by a preponderance of the evidence."[2] In their response to the *Daubert* motion, Plaintiffs identify the sources for the opinions. In support of his prolonged contact causation theory, Plaintiffs refer to three studies previously referenced by Dr. Aradillas: (1) Effects of Graded Mechanical Compression of Rabbit Sciatic Nerve on Nerve Blood Flow and Electrophysiological Properties; (2) Transient Conduction Block Following Acute Peripheral Nerve Ischemia; and (3) Evaluation and Management of Peripheral Nerve Injury.[3] In the first study, nerve injury resulted after clamping the nerves of rabbits for 10 to 20 minutes. In the second,

---

[1] 509 U.S. 579 (1993).
[2] *State v. McMullen*, 900 A.2d 103, 114 (Del. Super. 2006).
[3] Disclosure of Plaintiffs' Expert Witness Enrique Aradillas-Lopez, M.D. in Opposition to Defendants' Motion to Exclude Causation Opinions at 23–25.

3

restricting blood flow to the nerves of rats produced nerve injury in a 10- to 20-minute time span. The third study generally addresses the kinds and causes of nerve injury—noting penetrating injury and crush as potential causes. In addition, Plaintiffs cite to Dr. Aradillas's extensive history of treating CRPS patients as a source for his opinion. In Dr. Aradillas's deposition, he affirmed that he has encountered more than two dozen cases of CRPS caused by IV placement, but that among those, there were no "cases of CRPS caused by an IV stick where the IV was removed immediately," nor has he heard of any such case's being reported in scientific literature.[4]

In support of the needle dulling theory, Plaintiffs point to a document produced by Becton Dickinson, the manufacturer of the needle and IV catheter device used in this case, which warns that the needle can be dulled and damaged "after just one injection—and it may become worse each time you reuse . . . . A reused needle doesn't inject as easily or cleanly as a new one . . . ." Dr. Aradillas personally examined Mr. Kent, and reviewed his medical records as well as certain medical literature, prior to offering his opinion in this case.

Consistent with *Daubert,* Delaware Courts use the following factors to determine the admissibility of scientific or technical expert testimony: "(1) the witness is qualified as an expert by knowledge, skill, experience, training or education; (2) the evidence is relevant; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury."[5]

However, given the unique context of clinical medicine, rigid application of the above factors is inappropriate, and this Court has previously held that a "'soundly

---

[4] Aradillas Depo. 49.

[5] *Tolson v. State,* 900 A.2d 639, 645 (Del. 2006); *Eskin v. Carden,* 842 A.2d 1222, 1227 (Del. 2004).

performed' differential diagnosis *alone* satisfies the *Daubert* requirements for reliability in the context of clinical medicine."[6] The Fourth Circuit provides a useful definition of a differential diagnosis: "[d]ifferential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated."[7] A proper differential diagnosis typically involves "conduct[ing] a physical examination, tak[ing] a medical history, review[ing] clinical tests, including laboratory tests, and exclud[ing] *obvious* (but not all) alternative causes."[8]

As an initial matter, there is no dispute as to Dr. Aradillas's qualifications, the relevance of the intended testimony, and whether it would assist the trier of fact or would result in unfair prejudice. The instant dispute concerns whether the two opinions are based upon information reasonably relied upon by experts in the field.

Defendants' chief argument is that Dr. Aradillas has failed to rule out the possibility that Mr. Kent's CRPS was caused by the IV needle's initial piercing of the nerve rather than by prolonged contact with the IV cannula. Plaintiffs respond that Dr. Aradillas's personal experience treating CRPS patients is a reliable basis to rule out the possibility that the initial piercing of the nerve caused Mr. Kent's CRPS.

As indicated above, this Court's inquiry is limited, as Dr. Aradillas's opinion is given in the clinical medicine context of his diagnosis of Mr. Kent. This Court need only determine whether the differential diagnosis was soundly conducted. The record indicates that Dr. Aradillas performed a physical examination of Mr. Kent,[9] took his medical

---

[6] *State v. Salasky*, 2013 WL 5487363, at *26 (Del. Super. Sept. 26, 2013); *McMullen*, 900 A.2d at 118.
[7] *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir. 1999).
[8] *McMullen*, 900 A.2d at 117.
[9] Aradillas Depo. 79.

history,[10] reviewed clinical tests, including an ultrasound performed by Dr. Johannes Roedl,[11] and excluded obvious alternative causes, such as the initial needle strike.[12]

The Court finds Plaintiffs' argument convincing that Dr. Aradillas may rely on his experience treating CRPS patients to rule out such an alternative cause. While it appears that there is no Delaware case law directly on this point, the Supreme Court of Wyoming has held, for reasons this Court finds persuasive, that a physician's experience treating "numerous patients with" CRPS is a reliable basis on which to base a differential diagnosis determining the type of trauma that produced a particular patient's CRPS.[13]

The Court next turns to Dr. Aradillas's dulled needle theory. During his deposition, Dr. Aradillas stated that when a needle is used a second time "you're going to have to use a lot more strength to push it in and that of itself is going to be more painful and you'll have less control of how you stick it into the patient." When questioned on the basis for that opinion, Dr. Aradillas answered, "It was something that I was taught during my pain fellowship." Plaintiffs' counsel also produced, as a basis for the opinion, warnings issued by the manufacturer of the needles, Becton Dickinson, which advises that "[a] reused needle doesn't inject as easily or cleanly as a new one and can cause *pain*, bleeding, and

---

[10] Aradillas Depo. 72–76.

[11] Aradillas Depo. 35. Defendant expressed skepticism at oral argument that an ultrasound is an appropriate method for identifying a nerve injury, despite not raising this as a basis for the preclusion of Dr. Aradillas's opinions in Defendants' written motion. While Plaintiffs have not provided literature forming the basis of Dr. Aradillas's opinion that an ultrasound is appropriate, they were not put on notice to do so. The Court finds the argument to be improperly raised and does not consider it here.

[12] Aradillas Depo. 41–46 (explaining his prolonged contact theory, and explaining why brief contact will not cause CRPS).

[13] *Easum v. Miller*, 92 P.3d 794, 804 (Wyo. 2004). In *Easum*, a doctor used his personal experience treating CRPS patients to determine that a patient had received CRPS from an electrical shock. This diagnosis was considered valid even in the absence of supportive literature. Note that the *Easum* opinion refers to CRPS by an older term, Reflex Sympathetic Dystrophy, or RSD. *See* https://www.webmd.com/brain/reflex-sympathetic-dystrophy-syndrome ("Reflex sympathetic dystrophy syndrome (RSDS), *also known as complex regional pain syndrome*, is a rare disorder of the sympathetic nervous system that is characterized by chronic, severe pain.") (emphasis added).

bruising."[14] In essence, Dr. Aradillas's inference is that because CRPS is caused by "trauma that must be perceived as painful for that particular patient,"[15] the painful injection of a reused needle into Mr. Kent's forearm contributed to Mr. Kent's development of CRPS. As indicated above, because this opinion is part of Dr. Aradillas's soundly conducted differential diagnosis, it is reliable. Further, the Court considers Dr. Aradillas's training and the warning issued by Becton Dickinson to be reliable bases upon which to form his opinion.

Despite the above, Defendants have repeatedly argued that Dr. Aradillas's opinion constitutes an *ipse dixit*, in which Dr. Aradillas invokes his status as an expert as the sole basis for his opinion, without explaining his methodology. Defendants argue that Dr. Aradillas's opinion is analogous to an expert opinion analyzed in this Court's *Jones v. Astrazeneca* decision.[16] In that case, the expert "declined to walk through her methods, and instead repeatedly intoned that she had reviewed all of the information she was supplied, applied her training and experience, and 'put it all together.' She specifically denied employing a 'differential diagnosis' methodology and declined to characterize her approach beyond her abstruse 'put it all together' explanation."[17] The *Astrazeneca* Court found that the expert had failed to articulate a reliable methodology for her causation opinion.[18]

In contrast, Dr. Aradillas has pointed to a variety of supportive literature, has explained his reasoning in detail through depositions, reports, and disclosures, and has employed a differential diagnosis. The Court concludes that Dr. Aradillas has sufficiently explained his methodology.

---

[14] Emphasis added.
[15] Aradillas Depo. 34.
[16] 2010 WL 1267114 (Del. Super. Mar. 31, 2010).
[17] *Id.* at *10.
[18] *Id.*

Therefore, the Court finds that Dr. Aradillas's opinions are reliable and comply with the standards set forth in the *Daubert* line of cases. Defendants' motion to preclude Dr. Aradillas's opinions is accordingly denied.

**B.      Plaintiffs' Motion to Exclude Testimony of Daniel M. Feinberg, M.D.**

Plaintiffs contend that Daniel M. Feinberg, M.D. (hereinafter "Dr. Feinberg"), must be precluded from offering certain opinions, as they are not reliable and are unduly prejudicial. In particular, Plaintiffs object to Dr. Feinberg's potential opinion testimony that (1) CRPS is a known risk of the initial insertion, rather than prolonged placement, of an IV catheter placed in accordance with the standard of care, and (2) Mr. Kent's CRPS was in fact caused by a non-negligent initial insertion of an IV catheter. Plaintiffs argue that Dr. Feinberg has offered no support for the truth or reliability of these propositions.

Defendants have stated in their written response to Plaintiffs' motion that "[i]t is Dr. Feinberg's opinion that Mr. Kent's CRPS was caused by the initial insertion the [sic] of the IV needle (which no one is claiming was inserted in a negligent matter) and was unrelated to the amount of time that the IV catheter remained in Mr. Kent's arm."[19] Defendants also contend that "Dr. Feinberg's opinions are well supported."[20] In Dr. Feinberg's evaluation report of his examination of Mr. Kent, he states that "[t]he literature cites cases in which patients develop RSD[21] after minor trauma, including needle sticks and IV placement."

However, at oral argument, Defendants were asked what specific literature Dr. Feinberg intended to rely on, and defense counsel later responded in writing that Dr. Feinberg will not be "relying on specific literature," but instead "will rely on his general

---

[19] Defendants' Response at 3.
[20] *Id.*
[21] *See supra* note 12. Reflex Sympathetic Dystrophy or RSD is an older term for CRPS.

knowledge of the medical literature on venipuncture-caused CRPS."[22] Additionally, Defendants appear to retreat from their earlier representation that Dr. Feinberg will opine that Mr. Kent's CRPS was caused by the initial insertion of the IV catheter. Rather, Defendants intend to elicit testimony from Dr. Feinberg that will "make the point at [sic] the published medical literature includes no evidence linking prolonged compression of a nerve in the context of venipuncture with CRPS."[23]

The Court here applies the *Daubert* standard explained above, with the distinction that Dr. Feinberg did not perform a differential diagnosis in reaching his causation opinion.[24] As indicated previously, "[c]ausation of injury must be supported by more than the word of [the expert]."[25] The Court will not take experts at their word that the literature says what they claim it says, but requires opinions to be supported by scientific bases.

Here, the Court finds that because Dr. Feinberg did not perform a differential diagnosis and does not rely on any specific literature to support his opinions, they are not reliable. Therefore, any attempt by Dr. Feinberg to offer a medical expert opinion that Mr. Kent's CRPS was caused by the initial needle stick, or that CRPS is a known risk of the proper insertion of an IV catheter, will not be permitted. Defendants have not produced any reliable bases for these opinions—proposing to rely merely on Dr. Feinberg's "general knowledge of the medical literature" without citation to any specific studies. The Court will not permit Dr. Feinberg to offer an *ipse dixit* as to what the literature does or does not say. However, insofar as Dr. Feinberg intends merely to point

---

[22] Defendants' Supplemental Briefing at 2.

[23] *Id.*

[24] In their response to Plaintiff's motion to exclude certain opinions of Dr. Feinberg, Defendants do not contend that Dr. Feinberg performed a differential diagnosis. In addition, Dr. Feinberg's September 26, 2017 evaluation of Mr. Kent does not clearly identify a cause of Mr. Kent's CRPS, but rather critiques Dr. Aradillas's methodology.

[25] *Jones v. Astrazeneca*, 2010 WL 1267114 at *9 (Del. Super. Mar. 31, 2010).

out how certain studies cited by Dr. Aradillas do not support Dr. Aradillas's theories, and identify logical inconsistencies in his reasoning, he is free to do so.

### C. Defendants' Motion to Preclude Standard of Care Opinions of Elizabeth Nottingham, R.N.

Defendants contend that the opinions of Elizabeth Nottingham, R.N. (hereinafter "Nurse Nottingham") are inadmissible because they are irrelevant and unduly prejudicial.

The expected opinion testimony to which Defendants object is as follows: "it was a breach of the standard of care for medical documentation for Nurse Seaman to make late entries to Mr. Kent's Blue Hen Surgery patient record more than three years after his June 26, 2014 endoscopy procedure."[26] Defendants argue that this testimony is irrelevant because it cannot support a claim for medical negligence, specifically contending that there is no causal link between the deviation from the applicable standard of care and the alleged injury.[27]

Plaintiffs reply that testimony demonstrating that any chart alterations constituted a breach of the standard of care is directly relevant because "the accuracy of the chart is in question, the credibility of the defense experts for relying upon the written chart is in question, and the credibility of the other defense witnesses is in question."[28]

The Court disagrees. Whether Plaintiffs should be able to impeach defense witnesses with evidence of the chart's alteration is not at issue.[29] The question is whether testimony on the standard of care for medical documentation is relevant to Plaintiffs' case-in-chief. The Court finds that this testimony does nothing to establish Plaintiffs'

---

[26] Plaintiffs' Rebuttal Expert Witness Disclosure for Elizabeth Nottingham, RN, at 1.
[27] *See* 18 *Del. C.* § 6853(e) (liability based upon expert testimony as to deviation from standard of care and as to causation of personal injury).
[28] Plaintiffs' Opposition to Defendants' Motion *in Limine* to Preclude Standard of Care Opinions of Elizabeth Nottingham, RN, at 5.
[29] That issue is addressed in *infra* section II.F.

entitlement to damages. Assuming *arguendo* that the chart alteration did constitute a breach of the standard of care, such a breach has no causal relationship with Mr. Kent's injuries.

The only potential uses this Court can foresee, regarding an opinion that Nurse Seaman breached a standard of care when she altered the medical charts, are improper. The Court considers it likely that this evidence might be used to suggest that Nurse Seaman's breach of the standard of care in medical documentation speaks to the character of BHSC's agents generally, and that other of its agents breached a standard of care regarding Mr. Kent's treatment. This of course would be prohibited.[30] Plaintiffs' failure to articulate a proper use of the evidence, in addition to the evidence's apparent risk of prejudice, leads the Court to find that Nurse Nottingham's proposed testimony is impermissible and that the evidence should be excluded from the case-in-chief.[31]

## D. Defendants' Motion to Strike Expert Disclosure and Preclude Expert Testimony of Michelle Smeltzer, MSN

Defendants argue that Michelle Smeltzer, MSN (hereinafter "Nurse Smeltzer") should be precluded from testifying for the following reasons: (1) Nurse Smeltzer was untimely identified; (2) Nurse Smeltzer's testimony is cumulative; and (3) Nurse Smeltzer's testimony is in part irrelevant.

Pursuant to Plaintiffs' disclosure, Nurse Smeltzer is anticipated to provide rebuttal testimony concerning alleged breaches of the standards of care regarding reusing a needle and leaving an IV catheter in Mr. Kent's arm despite his complaints of pain. Additionally, Nurse Smeltzer is expected to testify that it was a breach of the standard of care for Nurse Seaman to make entries to Mr. Kent's patient record more than three years after his

---

[30] D.R.E. 404(a).
[31] D.R.E. 402, 403.

11

procedure, as well as for BHSC and Nurse Tiller to fail to document Mr. Kent's follow up call to the BHSC to report post-procedure pain and other symptoms.

The Court shall first examine whether Nurse Smeltzer's identification was untimely. Plaintiffs' expert disclosure was set for June 30, 2017, and Plaintiffs' rebuttal expert deadline was November 15, 2017. Nurse Smeltzer was identified on November 15, in compliance with the rebuttal expert deadline. However, Defendants complain that the scope of her proposed testimony goes beyond the scope of rebuttal, and is intended for use in Plaintiffs' case-in-chief. Defendants' motion characterizes the designation of Nurse Smeltzer as a "vexatious litigation tactic" that is "sanctionable under Superior Court Civ. R. 11." In support of these serious allegations of misconduct, Defendants rely on several cases distinguishable from the case at hand, cases that are either concerned with the presentation of rebuttal evidence *at trial*,[32] or are from other jurisdictions.[33] Defendants have presented no authority to convince the Court that Nurse Smeltzer's identification was improper.

Defendants further argue that Nurse Smeltzer's anticipated testimony is cumulative, as Nurse Smeltzer is expected to testify regarding many of the same areas on which other of Plaintiffs' experts, such as Nurse Nottingham, are expected to testify. Specifically, cumulative testimony is anticipated regarding the alleged breaches of care

---

[32] Not only are they not controlling in this case, but the cases cited are not particularly favorable to Defendants' argument. *See Herhal v. State*, 283 A.2d 482, 485 (Del. 1971) ("it is entirely proper for the affirmative side to give evidence in rebuttal in reply to the evidence of the other side of the case. And we further held that if as an incidental this rebuttal evidence tends to corroborate and strengthen the case in chief, that of itself is not error. *The matter is always to be left to the discretion of the trial court.*") (emphasis added); *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 3207155 at *1 (Del. Ch. July 28, 2017) ("The fact that rebuttal evidence also tends to corroborate the party's affirmative case does not require its exclusion.").

[33] *United States v. 9.345 Acres of Land, More or Less, Situated in Iberville Par., Louisiana*, 248 F. Supp. 3d 772, 776 (M.D. La. 2017).

(1) that the IV catheter was left in Mr. Kent's arm for too long despite his complaints, and (2) that the same needle was inserted into Mr. Kent's arm multiple times.

Curiously, Plaintiffs' written response does not answer the arguments that this testimony is cumulative. Plaintiffs have other experts, including Dr. Aradillas and Nurse Nottingham, who are expected to testify as to these breaches. As Nurse Smeltzer would be the third expert to offer this standard of care opinion, and the second nurse, it appears likely that the evidence would indeed be cumulative.

The Supreme Court of Delaware has instructed that "[w]hile a trial judge may limit a party's presentation of evidence on the ground that it is cumulative, such authority should be exercised sparingly so as not to deprive a litigant of the right to manage the presentation of her evidence."[34] Even so, Plaintiffs did not utilize the opportunity in their written response to articulate any way in which Nurse Smeltzer's apparently cumulative testimony would be distinct from the opinions of Dr. Aradillas and Nurse Nottingham. At the hearing, Plaintiffs' counsel additionally represented that there were no significant differences between Nurse Smeltzer's and Nurse Nottingham's testimony regarding phlebotomy standards of care. Despite the frank admission that these witnesses' testimonies are largely identical, the Court gives deference to the Plaintiffs' right to elect how to present their evidence—at this stage. For example, Plaintiffs may choose to present Nurse Smeltzer's opinions on these matters rather than those of Dr. Aradillas or Nurse Nottingham, a choice that an order forbidding such opinions from Nurse Smeltzer would preclude. Therefore, the Court shall reserve decision on whether any testimony elicited is impermissibly cumulative, and admonishes Plaintiffs to be aware of such a possibility in preparing their case.

Finally, the Court's ruling regarding allegedly irrelevant standard of care testimony with regard to medical documentation is guided by its ruling on Nurse Nottingham's

---

[34] *Green v. Alfred A.I. duPont Inst. of Nemours Found.*, 759 A.2d 1060, 1065 (Del. 2000).

13

intended testimony. The Court will not allow standard of care testimony on those subjects to be elicited in Plaintiffs' case-in-chief, as Plaintiffs have failed to articulate a relevant use for the evidence.

## E.    Defendants' Motion to Exclude Vouching Evidence

Defendants assert that "Plaintiffs intend at trial to parade before the jury a line of Mr. Kent's friends and co-workers to vouch for his credibility, although he has not been accused of being a dishonest person." Defendants object to the intended testimony, as Delaware Rule of Evidence 608 permits vouching for a witness's character for truthfulness "only after the character of the witness for truthfulness has been attacked." While Defendants disagree with Mr. Kent's version of the events at issue in this case, they contend that they have not portrayed and will not portray him as a dishonest person.

In response, Plaintiffs assert that they intend to elicit testimony concerning Mr. Kent's character for truthfulness because it is relevant to damages. Plaintiffs contend that "issues of fact exist whether Mr. Kent was likely to have been promoted within the next five years and whether he was at risk for unemployment," and Plaintiffs consider honesty and integrity to be "imperative trait[s] in police work."

While Mr. Kent's character for truthfulness may be relevant to Plaintiffs' case concerning damages,[35] the Court finds that any probative value is substantially outweighed by the potential for unfair prejudice, and the testimony will not be permitted under Delaware Rule of Evidence 403. The probative value of the evidence is minimal, as the Court finds that there are various other more adroit methods of showing Mr. Kent's likelihood of promotion or termination, such as testimony concerning his past work performance. With regard to prejudice, the Court is concerned that the elicitation of such

---

[35] D.R.E. 402. Such character may render his likelihood of promotion or termination more or less probable.

testimony may allow Plaintiffs to bolster unfairly Mr. Kent's credibility as a witness, circumventing the restrictions of Delaware Rule of Evidence 608.

The Court notes that it is possible that defense counsel or one of the defense witnesses may yet opine or suggest that Mr. Kent is not trustworthy. Should the Court determine that such an attack on Mr. Kent's character has occurred, the Court may allow rebuttal testimony to refute the attack.

## F.     Defendants' Motion to Preclude Evidence of Nurse Seaman's Alteration of Mr. Kent's Medical Chart

At oral argument, the Court indicated that it viewed as "extreme" Defendants' assertion that Plaintiffs should be precluded from offering any evidence of Nurse Seaman's post-procedure alterations to Mr. Kent's medical records.[36] Upon further consideration of this issue, however, the Court finds that Plaintiffs should be precluded from offering any such evidence in their case in chief, since the probative value of such evidence, if any, is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

The probative value of these alterations is minimal because they do not go to the alleged breaches of the standards of care at issue in this case. As discussed previously, any alleged breach of the standard of care in connection with Nurse Seaman's alteration of the records bears no causal relation to Mr. Kent's injuries.

In two decisions from other jurisdictions cited by Defendants (and previously cited by Plaintiffs in connection with another motion), evidence of post-procedure alteration of records was allowed because such evidence went directly to the alleged standard-of-care

---

[36] As noted previously, prior to her deposition, Nurse Seaman made certain additions to the "Post-Procedure" record regarding Mr. Kent.

breaches in those cases. In *Schwochow v. Chung,*[37] evidence that the defendant had altered a medical record by adding the words "no fever" was found to be "relevant to the ultimate issue of the adequacy of care" provided by the defendant, where the patient had died of undiagnosed meningitis after being treated by the defendant. Similarly, in *Rosenblit v. Zimmerman,*[38] evidence that the defendant chiropractor had destroyed medical records was found to be relevant to whether the defendant had breached the standard of care, where the destroyed records showed that the plaintiff's condition was declining during her treatment by the defendant, while the defendant claimed that he had continued to treat the plaintiff because she was improving. In this case, by contrast, Nurse Seaman's additions have nothing to do with the central issue in this case: whether standard-of-care breaches by Defendants resulted in injury to Mr. Kent.

Plaintiffs argue that Nurse Seaman's additions to the records are probative because they demonstrate Defendants' efforts to cover up previous failures to complete the record. However, Defendants concede that they failed to complete Mr. Kent's post-procedure chart—specifically, that they failed to indicate Mr. Kent's "Post-Procedure Sedation Score" for the time of discharge. Thus, presentation of evidence suggesting an attempted "cover-up" threatens only to confuse or mislead the jury about this issue. In addition, such evidence could cause unfair prejudice to Defendants by, *e.g.*, encouraging the jury to "punish" Defendants for Nurse Seaman's late additions to the medical records.

Delaware Rule of Evidence 404(b) provides that evidence of wrongful acts other than those at issue in a case may not be admitted to prove that a defendant acted "in conformity therewith," but may be offered as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Court can

---

[37] 102 Ohio App. 3d 348 (1995).
[38] 766 A.2d 749 (N.J. 2001).

conceive of no purpose the evidence of the chart's alteration would serve other than as proof of Blue Hen's—and its employees'—propensity for altering the medical records of patients.[39]

Evidence of Nurse Seaman's additions does nothing to demonstrate a motive to avoid malpractice or professional misconduct charges, as by the time the alterations were made, the instant suit was already initiated, and Defendants' motive to avoid liability is self-evident. Use of the evidence to show a motive, as indicated previously, to "cover up" Defendants' existing liability, would require that the jury conclude that Nurse Seaman was not aware that the document in question had already been provided to Plaintiffs—a suggestion that fails to fit with Plaintiffs' apparent theory, expressed at oral argument, that Nurses Seaman and Tiller colluded to alter the records, since Nurse Tiller, as a defendant in the action, was presumably aware of the prior course of discovery; secondly, such a theory ignores the fact that the information added by Nurse Seaman does not address Mr. Kent's complaints of pain or the absence of such complaints. Similarly, there appears to be no question or dispute concerning BHSC's ability or opportunity to alter records stored in its own facilities.

While Plaintiffs claim that the evidence's probative value is great, as it tends to demonstrate the inaccuracy of the records generally, Plaintiffs explained at the hearing that they have other opportunities to show that there are omissions in Defendants' recordkeeping with regards to this case. Any additional probative value of Nurse Seaman's alteration of the medical chart in establishing any of the elements listed in Rule 404(b) is minimal, and is substantially outweighed by the prejudicial effect of otherwise irrelevant proof that a Blue Hen employee altered patient records. For these reasons, evidence of Nurse Seaman's alteration of the records shall be precluded from Plaintiffs'

---

[39] *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del. 1996) (evidence properly excluded when it would be used to show a company's propensity to commit other similar bad acts).

case-in-chief.[40] At trial, should Plaintiffs seek to cross-examine one of the defense witnesses by reference to Nurse Seaman's additions to Mr. Kent's medical chart, the Court expects to be notified of such intention first, outside the presence of the jury.

### G. Defendants' Motion to Preclude Cumulative Lifestyle Testimony Concerning Plaintiffs' Damages

The Court's decision here is guided by its ruling *supra* concerning the admission of cumulative or duplicative testimony. It appears that if Plaintiffs attempted to elicit all testimony indicated in their discovery disclosure, much of it would be duplicative. The Court will not allow repetitive elicitation of testimony from lifestyle witnesses concerning damages. However, the Court reserves the decision to preclude such testimony until a later time, and fully expects that Plaintiffs will make efforts to select the testimony that best represents their case and will not waste the time of the Court, opposing counsel, and the jury.

## III. Conclusion

**WHEREFORE**, for the foregoing reasons,

Defendants' motion to preclude the causation opinions of Enrique Aradillas-Lopez, M.D., is **DENIED**;

Plaintiffs' motion to exclude certain testimony of Daniel M. Feinberg, M.D., is **GRANTED**;

---

[40] *See United States v. Mermelstein*, 487 F. Supp. 2d 242, 262–63 (E.D.N.Y. 2007) (excluding evidence of unrelated alteration of medical chart where court considered most likely use of the evidence would be "as proof of [defendant's] propensity for altering the medical records of his patients.").

Defendants' motion to preclude rebuttal standard of care opinions of Elizabeth Nottingham, R.N., is **GRANTED**;

Defendants' motion to strike expert disclosure and preclude the expert testimony of Michelle Smeltzer, MSN, is **DENIED** in part and **GRANTED** in part as previously indicated, with the Court's reserving decision concerning any rebuttal testimony until the close of Defendants case;

Defendants' motion to exclude vouching evidence is **GRANTED** in part, and **DENIED** insofar as the Court reserves decision concerning any rebuttal testimony until the close of Defendants' case;

Defendants' motion to preclude evidence of Nurse Seaman's alteration of the medical chart is **GRANTED**; and

Defendants' motion to preclude cumulative lifestyle testimony concerning Plaintiffs' damages is **DENIED** without prejudice.

**IT IS SO ORDERED.**

                    __/s/ Noel Eason Primos_____

NEP/wjs
*Via File & ServeXpress*
oc.    Prothonotary
cc.    Counsel of Record